Philip G. Jones (1748)
Attorney/Chapter 7 Trustee
1215 South Main Street
Orem, UT  84058
Telephone: (801) 224-5750
Email:  trustee@theo7.com

---

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Bankruptcy No. 22-20446 (WTT) |
| H2O, INC., | Chapter 7 |
| Debtor. | |

## MOTION FOR ORDER:  (A) APPROVING BID PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF DEBTOR'S ASSETS; (B) AUTHORIZING THE SALE OF DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (C) WAIVING THE 14-DAY STAY OTHERWISE APPLICABLE UNDER BANKRUPTCY RULES 6004 AND 6006; AND (D) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Comes now, Philip G. Jones, Trustee of the estate of H2O, Inc. (the "Debtor"), pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, and Federal Rules of Bankruptcy Procedure 2002, 6004, and 6006, and respectfully submits this motion (the "Motion") seeking entry of orders: (a) approving bid procedures for the sale of the Debtor's assets; (b) authorizing the sale of the Debtor's assets free and clear of liens, claims, encumbrances and interests; (c) waiving the 14-day stay otherwise applicable under Bankruptcy Rules 6004 and 6006; and (d) authorizing the assumption and assignment of certain executory contracts and unexpired leases.  In support of this Motion, the Trustee respectfully represents as follows:

{00613043.DOCX / 3}

## JURISDICTION AND GENERAL BACKGROUND

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The Debtor filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") on February 11, 2022.

5.      The Debtor has closed its operations.

6.      A Chapter 7 trustee has been appointed, and the 341 Hearing has been held.

## H2O BACKGROUND

7.      The Debtor was in the business of developing technology for use by dentists.  The Debtor did business under the name "Dentavations".  The Debtor was attempting to commercialize technology for a dental tool that is designed to use a water fluid stream for cavity preparation rather than a metal drill.

8.      The Debtor used technology originally patented by Brigham Young University ("BYU") and licensed by BYU to the Debtor.

9.      The Trustee has concluded in his reasonable business judgment that a prompt sale of substantially all of the Debtor's assets is appropriate.

10.     The Trustee has entered into Binding Term Sheet (copy attached as Exhibit A) with Intuitive Funding, LLC (the "Buyer") in anticipation of entering into an Asset Purchase Agreement for the purchase of substantially all of Debtor's assets.  A copy of the proposed Asset Purchase Agreement (the "APA") is attached as Exhibit B.

{00613043.DOCX / 3}

11.     Subsequent to entering into the Binding Term Sheet, the Trustee received

an oral competing offer to purchase the Debtor's assets for $30,000.  The Buyer then

agreed to increase its offer to $35,000, subject to higher and better offers on the terms

and conditions of the Binding Term Sheet and the APA.  The Buyer and the Trustee have

also agreed to modify the dates and deadlines in the Binding Term Sheet consistent with

this motion and the proposed Bid Procedures (as defined below).

12.     The Trustee submits this Motion seeking approval of proposed bid

procedures and the proposed sale to the Buyer or another purchaser (the "Sale"), and

seek related relief as set forth below.

## RELIEF REQUESTED

13.     The Trustee requests entry of an order, substantially in the form attached

hereto as Exhibit 1, approving the bid procedures attached to the proposed order (the

"Bid Procedures")[1] for the proposed sale of substantially all of the Debtor's assets (the

"Assets").  For the avoidance of doubt, parties may submit bids for less than all of the

Assets; for example, a party may submit a bid for the Debtor's patents and intellectual

property, but not its hard assets or causes of action.  The Trustee has reserved a hearing

to be held May 18, 2022, at 1:00 p.m. during which the Trustee will seek Court approval

of the Bid Procedures portion of this Motion

14.     The Trustee also requests that, if the Bid Procedures are approved, the

Court hold a hearing (the "Sale Hearing") to approve any Sale of the Assets pursuant to

---

[1] Capitalized terms used by not defined herein shall have the meaning ascribed in the Bid Procedures.  Any
summary of or reference to the Bid Procedures in this Motion is qualified in its entirety by the Bid
Procedures, attached hereto as Exhibit 1.  To the extent there are any conflicts between any summary or
reference and the Bid Procedures, the terms of the Bid Procedures shall govern.

{00613043.DOCX / 3}

the Bid Procedures on July 20, 2022, at 1:00 p.m. The Trustee further requests waiver of

the 14-day stay that otherwise would apply under Bankruptcy Rules 6004 and 6006, on

the ground that unnecessary expenses would accrue to the estate during that period.

15.     Finally, the Trustee seeks authority to assume, and assign to the

Successful Bidder (defined below), any unexpired leases and executory contracts to the

extent the Successful Bidder requests such assumption and assignment in its bid.

**A.     The APA**

16.     The Trustee negotiated, in good faith and at arm's length, the proposed

sale terms with the Buyer, as set forth in the APA.  The Buyer understands that its

purchase proposal, as set forth the APA, will serve as the "stalking horse" bid at the

Auction and is subject to higher and better offers and the approval of this Court.

17.     Under the APA, the Buyer has offered to purchase the Assets, except the

Excluded Assets (as defined in the APA), for (a) cash in the amount of $35,000

(allocated, in the case of a competing bid, $15,000 for the claims and causes of action

described under subparagraph (g) of the definition of "Assets" under the APA; and

$20,000 for the remainder of the Assets).

18.     Further, the Assets will be sold to the Buyer free and clear of all liens,

claims, interests and any and all other encumbrances of any kind or nature to the fullest

extent possible under 11 U.S.C. § 363(f).

19.     The APA represents the highest and best purchase offer (indeed, the only

written purchase offer) that the Trustee has received to date for the Assets, and the best

available opportunity to maximize value for the Debtor's creditors.

**B.     The Bid Procedures**

20.     As described above, the Trustee believes that a controlled liquidation of the
Assets is the best way to maximize returns to creditors.  The Trustee proposes to further
test the marketplace through the proposed bidding process, as set forth in the Bid
Procedures, to allow the Trustee a reasonable and fair opportunity to maximize the value
they receive for the Assets.

21.     A copy of the proposed Bid Procedures is included within Exhibit 1 and
incorporated herein by this reference.

22.     Any entity may become a "Qualified Bidder" under the Bid Procedures by
providing to the Trustee on or before June 27, 2022 at 4:00 p.m. prevailing Mountain
time, the following:  (a) a "mark-up" of the APA to show any variances between the APA
and the competing bid; (b) minimum consideration of $5,000 more than the APA; and (c)
written proof satisfactory to the Trustee of the competing bidder's financial ability to
perform.  Within 1 business day after receiving these items the Trustee will notify any
potential bidder and also the Buyer whether it has qualified as a Qualified Bidder.

23.     The Trustee will consider a bid to be a Qualified Bid only if the bid is on
terms that are not conditioned on obtaining financing or on the outcome of unperformed
due diligence by the bidder.  A bid received from a Qualified Bidder that includes all of the
Required Bid Documents and meets the other requirements set forth above is a
"Qualified Bid."  The APA is deemed to be an acceptable Asset Purchase Agreement and
to satisfy all other requirements of a Qualified Bid and the Buyer is deemed to be a
Qualified Bidder.

{00613043.DOCX / 3}

24.     If any Qualified Bids are timely received in addition to the APA, the Trustee

shall conduct an auction (the "Auction") with respect to the Assets and/or other property

as to which a Qualified Bid has been received.  The Auction shall take place at <u>10:00</u>

<u>a.m. on July 12, 2022</u> at the offices of the Buyer's counsel, Cohne Kinghorn, P.C., 111

East Broadway, 11th Floor, Salt Lake City, Utah 84111.  At the Trustee's discretion,

Qualified Bidders may participate in the Auction by telephone or zoom.

25.     The Trustee intends to conduct the Auction by announcing the highest and

best Qualified Bid received.  The Trustee will then open the Auction to competing bids.

The Assets will be sold in two lots, first the assets identified in A(1-4) in the Binding Term

Sheet, and then the assets identified in A(5) in the Binding Term Sheet.  The highest and

best bid received by the Trustee will be the starting bid at the Auction.  Parties may

submit successive bids by open cry.  All Qualified Bidders shall have the right to submit

additional bids and make modifications to their respective Asset Purchase Agreements at

the Auction to improve such bids.  The Auction may include individual negotiations

between the Trustee and the Qualified Bidders.  The Trustee may announce a recess or

recesses at any time and for any reasonable period during the Auction.  The parties may

request a recess or recesses from the Trustee in order to consult with advisors, conduct

individual negotiations with the Trustee, or for other reasons, and the Trustee may in his

reasonable discretion agree to any such recess requested by either of the parties.  The

Trustee will record the proceedings of the Auction.

26.     At the Auction, the Trustee, will (a) review each bid elicited at the Auction

on the basis of financial and contractual terms and the factors relevant to the sale

process, including those factors affecting the speed and certainty of consummating the

Sale; and (b) identify the highest and/or otherwise best offer or group of offers for the Assets (the "Successful Bid(s)").  At the Sale Hearing, the Trustee will present the Successful Bid(s) for approval to the Bankruptcy Court and seek prompt entry of an order approving the Sale.

27.    The Trustee proposes that, subject to Court approval at the bid procedures hearing, the Buyer will receive a break-up fee (the "Fee") in the event that its bid is not selected by the Trustee as the highest and best bid for either of the baskets of the Assets in an amount equal to the lesser of the following three amounts: (a) 3% of the total consideration received by the Trustee for the Assets from a bidder other than a Buyer; (b) one-third of the difference between $35,000 and the total consideration received by the Trustee from a bidder other than a Buyer for the Assets; and (c) the actual, necessary expenses incurred by the Buyer, including legal fees, due diligence and other costs incurred in connection with the Buyer's due diligence, negotiation and documentation of the proposed purchase (including this Binding Term Sheet, bid procedures motion and order, and investigations under Fed. R. Bankr. P. 2004 to conduct due diligence), including any cost incurred for prototype demonstration, all as determined by the Bankruptcy Court.  The Break-Up fee shall be deemed an allowed super-priority administrative expense claim under sections 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code, senior to all other super-priority claims in the Debtor's bankruptcy case, other than the fees and expenses of the Trustee and his professionals.  The Break-Up Fee shall be due and payable to the Buyer upon the closing of a sale of any of the Assets to a buyer other than the Buyer.

{00613043.DOCX / 3}

28.     The Trustee intends to take into account the Fee in his determination of the

highest and best bid at the Auction.

29.     The Trustee intends to close the sale(s) by no later than July 26, 2022,

subject to prior entry by the Court of an order approving the Sale.


**C.     Assigned Contracts**

30.     In connection with the Sale of the Assets, the Trustee seeks authority to

assume and assign certain unexpired leases and executory contracts to the Successful

Bidder pursuant to Bankruptcy Code § 365.  In particular, the Debtor seeks authority to

assume and assign to the Buyer the contracts so identified in connection with the APA,

and/or any other executory contracts or unexpired leases in connection with a Sale to a

different Successful Bidder to the extent the Successful Bidder requests such assumption

and assignment in its bid.

31.     The APA will include a schedule or exhibit identifying the contracts and

leases to be assumed under the APA along with the "cure" amount (if any) that the

Trustee believes is owed under such contract or lease.  To the extent a different

Successful Bidder identifies any other contract or lease to be assumed, the Trustee will

provide a Cure Notice to the non-debtor party indicating that such party's contract or

lease may be assumed and assigned to the purchaser if that sale is consummated.  The

Cure Notice shall set a deadline by which the non-debtor party shall file an objection to

the Cure Amount, adequate assurances of future performance, or assumption and

assignment of the relevant executory contract or unexpired lease generally.  Any such

objections shall be addressed at the Sale Hearing or such other date as the Court

determines.

32.     The Trustee intends to request entry of an order requesting approval of the

assumption and assignment of any unexpired leases and executory contracts to the

Successful Bidder(s) at the Sale Hearing.

## APPLICABLE AUTHORITY

### A.     Bid Procedures

33.     Bankruptcy Code § 363 provides that a trustee, "after notice and a hearing,

may use, sell or lease, other than in the ordinary course of business, property of the

estate." Bankruptcy Code § 363(b).  To approve the use, sale or lease of property

outside of the ordinary course of business, a debtor must demonstrate:  "(1) that a sound

business reason exists for the sale; (2) there has been adequate and reasonable notice to

interested parties, including full disclosure of the sale terms and the Debtor's relationship

with the buyer; (3) that the sale price is fair and reasonable; and (4) that the proposed buyer

is proceeding in good faith." In re Medical Software Solutions, 286 B.R. 431 (Bankr. D. Utah

2002); accord Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722

F.2d 1063, 1071 (2d Cir. 1983) (identifying the "sound business purpose" test); In re Abbotts

Dairies of Penn., Inc., 788 F.2d 143, 145-47 (3d Cir. 1986) (implicitly adopting the

articulated business justification test of Lionel, and adding the "good faith" requirement).

34.     Bankruptcy courts generally defer to a Trustee's reasonable business

judgment regarding the sale of estate assets, unless such decision is arbitrary and

capricious.  See In re Curlew Valley Assocs., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981).

{00613043.DOCX / 3}

Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code."  Curlew Valley, 14 B.R., at 513-14 (footnotes omitted).

35.     The Trustee has sound business reasons for the proposed Sale.  As this is a Chapter 7 liquidation, the Trustee has a statutory duty to reduce the assets of the Debtor to cash for distribution to the Debtor's creditors.

36.     The Trustee submits that this Motion and the proposed Bid Procedures will provide adequate notice to parties in interest of the proposed Sale.  Among other things, the Trustee proposes to provide notice and sufficient time for parties in interest to submit objections and for bidders to formulate and submit competing proposals.

37.     The Trustee believes that the proposed sale price obtained through the Auction will likely represent fair value for the Assets.  The Trustee believes that exposing the Debtor's Assets to the market in this manner will be the best indication of the true value of those assets given the critical timing issues at play.

38.     The Trustee acknowledges that the Buyer may be an "insider" as defined in Section 101 of the Bankruptcy Code, but the Trustee submits that the Bid Procedures and terms of the APA satisfy even the heightened good faith requirement set out in the Medical Software Solutions case where an insider is involved.  See 286 B.R. at 445 (agreeing that where "the asset sale is to a purported insider, the purchaser has a heightened responsibility to show that the sale is proposed in good faith and for value"). The Trustee understands that the Buyer is affiliated with Thomas Thatcher, a board member of the Debtor.

{00613043.DOCX / 3}

39.     The Bankruptcy Code does not define "good faith."  Courts have therefore

turned to the traditional equitable definition of a "good faith purchaser"—a purchaser who

buys in "good faith" and for "value."  Tomkins v. Frey (In re Bel Air Assocs., Ltd.), 706

F.2d 301, 305 (10th Cir. 1983).  In addition, certain types of misconduct, including "'fraud,

collusion between the purchaser and other bidders or the trustee, or an attempt to take

advantage of other bidders,'" will "destroy a buyer's 'good faith purchaser' status."  Id.

(quoting In re Rock Indus. Machinery Corp., 573 F.2d 1195, 1197 (7th Cir. 1197)).

Although Tomkins was a case arising under the Bankruptcy Act, it remains good law in

this circuit.  See Plotner v. AT&T Corp., 224 F.3d 1161, 1171 (10th Cir. 2000) (citing

Tomkins with approval).

40.     As in Medical Software, the identity and role of the Buyer, the stalking horse

bidder, has been fully disclosed in this case.  See Medical Solutions, 286 B.R. at 445-446

(finding that debtor acted in good faith where the debtor "disclosed all elements of the

transaction, including the insider status of the proposed purchaser").

41.     In addition, the Trustee has engaged in good-faith arm's length negotiations

with the Buyer, and submits that the Buyer also has negotiated in good faith and at arm's

length to acquire the Assets.  The Trustee submits that the Buyer has proceeded in good

faith and is offering consideration that constitutes fair value for the Assets.  With respect

to the "value" requirement, the current value of the Assets is difficult to quantify, but the

Trustee believes that the proposed procedure for further exposing the Assets to an open

marketing and bidding process will demonstrate the market value of the Assets.

42.     As noted above, the APA is subject to higher and better offers, therefore,

the Trustee does not believe that the Buyer has engaged in any conduct that would

preclude this Court from making a "good faith" finding at the hearing to approve this

proposed Sale.  The Court, therefore, should conclude that the Bid Procedures, the Buyer,

and the APA meet each of the four <u>Medical Software Solutions</u> requirements.

**B.     The Sale Satisfies the Requirements of Bankruptcy Code § 363(f) for a Sale
Free and Clear of Liens, Claims, Encumbrances and Interests**

43.     Pursuant to Bankruptcy Code § 363(f), a trustee may sell property free and

clear of any lien, claim, or interest in such property, if, among other things:

(1)     applicable nonbankruptcy law permits sale of such property free and
clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is sold is
greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to
accept a money satisfaction of such interest.

44.     Because Bankruptcy Code § 363(f) is drafted in the disjunctive, satisfaction

of any one of the five requirements will be sufficient to permit the sale of the Assets free

and clear of liens, claims, encumbrances, pledges, mortgages, security interests,

charges, options, and other interests (collectively, the "Interests").

45.     The Trustee is not currently aware of any Interests in the Assets.  In the

event that unanticipated Interests are asserted against the Assets, the Trustee believes

that the holder of any such Interests could be compelled to accept a money satisfaction

of such Interests in legal or equitable proceedings in accordance with Bankruptcy Code §

363(f)(5).  The Trustee proposes that any Interests would attach to the net proceeds of

the Sale.  Accordingly, the Assets may be sold free and clear of any and all Interests

pursuant to Bankruptcy Code § 363(f)(5).

46.     Finally, since the Debtor did not disclose any Interests in its Assets, and the

Trustee is not aware of any such Interests, the Court should approve the sale free and

clear of any such Interests because they are subject to a bona fide dispute under

Bankruptcy Code § 363(f)(3).

**C.    Cause Exists to Waive the 14 Day Stay Otherwise Applicable
       Under Bankruptcy Rules 6004 and 6006**

47.     Bankruptcy Rule 6004(h) provides that unless the Court orders otherwise, all

orders authorizing the sale of property under Bankruptcy Code § 363 are automatically

stayed for 14 days after entry of the order.  Similarly, under Bankruptcy Rule 6006(d),

unless the Court orders otherwise, all orders authorizing the assignment of contracts or

unexpired leases are automatically stayed for 14 days after entry of the order.

48.     The Trustee submits that cause exists to waive the automatic 14-day stay

otherwise applicable under Bankruptcy Rules 6004(h) and 6006(d).  Closing the Sale at

the earliest possible time will reduce the costs of administering this estate and thus

maximize creditor recoveries.

**D.    The Assumption and Assignment of Executory Contracts and Unexpired
       Leases Should Be Authorized**

49.     Bankruptcy Code § 365(f)(2) provides that:

[t]he trustee may assign an executory contract or unexpired lease of the
debtor only if—

       (A)      the trustee assumes such contract or lease in accordance
with the provisions of this section; and

{00613043.DOCX / 3}

(B)    adequate assurance of future performance by the assignee of
such contract or lease is provided, whether or not there has been a default
in such contract or lease.

50.    Under Bankruptcy Code § 365(a), a trustee, "subject to the court's approval,

may assume or reject any executory contract or unexpired lease of the debtor."  11

U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the

requirements for assuming an unexpired lease or executory contract of a debtor.  This

subsection provides as follows:

(b)(1)  If there has been a default in an executory contract or
unexpired lease of the debtor, the trustee may not assume such contract or
lease unless, at the time of assumption of such contract or lease, the
trustee –

(A)    cures, or provides adequate assurance that the trustee
will promptly cure, such default;

(B)    compensates, or provides adequate assurance that the
trustee will promptly compensate, a party other than the debtor to such
contract or lease, for any actual pecuniary loss to such party resulting from
such default; and

(C)    provides adequate assurance of future performance
under such contract or lease.

11 U.S.C. § 365(b)(1).

51.    The meaning of "adequate assurance of future performance" depends on

the facts and circumstances of each case, but should be given a "practical, pragmatic

construction."  See e.g., EBG Midtown South Corp. v. McLaren/Hart Env. Engineering

Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); In re Prime

Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]though no single solution

will satisfy every case, the required assurance will fall considerably short of an absolute

guarantee of performance"); <u>Carlisle Homes, Inc. v. Azzari</u> (<u>In re Carlisle Homes, Inc</u>.),

103 B.R. 524, 538 (Bankr. D.N.J. 1988).

52.     Among other things, adequate assurance may be provided by

demonstrating the assignee's financial health and experience in managing the type of

enterprise or property assigned.  <u>See</u>, e.g., <u>In re Bygaph, Inc</u>., 56 B.R. 596, 605-06

(Bankr. S.D.N.Y. 1986) (reasoning that adequate assurance of future performance is

present when prospective assignee of lease from debtor has financial resources and has

expressed willingness to devote sufficient funding to business in order to give it strong

likelihood of succeeding).

53.     Under the APA, the Buyer has requested the Assumption and Assignment

of the "Assumed Contracts", with a cure amount of $0.  It is a condition to the Buyer's

purchase that BYU consents to the assumption and assignment of the Assumed

Contracts.

54.     The Court, BYU, and other interested parties will have sufficient opportunity

to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide

adequate assurance of future performance under the contracts to be assumed.  Thus, the

Court will have a sufficient basis to authorize the Trustee to assume and assign contracts

as will be set forth in an Asset Purchase Agreement.

WHEREFORE, the Trustee respectfully requests entry of an order (i) approving

the Bid Procedures in connection with the Sale of the Debtor's Assets; (ii) authorizing the

Sale free and clear of liens, claims, encumbrances and interests; (iii) waiving the 14-day

stay otherwise applicable under Bankruptcy Rules 6004 and 6006; (iv) authorizing

assumption and assignment of executory contracts and unexpired leases as selected by

the Successful Bidder(s); and (v) granting the Trustee such other and further relief as the

Court deems just and proper.

      Dated:       April 25, 2022

                                               /s/ Philip G. Jones
                                           PHILIP G. JONES, CHAPTER 7 TRUSTEE

EXHIBIT 1 – PROPOSED ORDER

*Order Submitted by:*

Philip G. Jones (1748)
Attorney/Chapter 7 Trustee
1215 South Main Street
Orem, UT  84058
Telephone: (801) 224-5750
Email:  trustee@theo7.com

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | Bankruptcy No. 22-20446 (WTT) |
| H20, INC., | Chapter 7 |
| Debtor. | |

## ORDER APPROVING BID PROCEDURES FOR SALE OF
## SUBSTANTIALLY ALL OF DEBTOR'S ASSETS

The matter before the Court is the *Motion for Order: (A) Approving Bid Procedures for Sale of Substantially All of Debtor's Assets; (B) Authorizing the Sale of Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests; (C) Waiving the 14-day Stay Otherwise Applicable Under Bankruptcy Rules 6004 and 6006; and (D) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases* (the "Motion"), filed on April 19, 2022, by Chapter 7 trustee Philip G.

Jones (the "Trustee").  The Motion came on for hearing before this Court on May 18,

2022, at 1:00 p.m. with regard to approval of the bid procedures set forth in the Motion.[1]

Appearances were noted on the record at the hearing.

THE COURT, having considered the Motion, having determined that appropriate

notice of the Motion was provided to creditors and parties in interest in this case, having

heard the statements of counsel at the hearing regarding the Motion, and having

determined that good cause exists for granting the relief sought through the Motion,

HEREBY ORDERS  AS FOLLOWS:

1.      The Motion is granted in part, specifically with regard to the Court's

approval of the Bid Procedures,[2] which are attached as <u>Exhibit 1</u> to this Order.

2.      All objections (if any) to the Motion or to any relief requested in the Motion

related to the Bid Procedures that have not been withdrawn, waived, or settled, and all

reservations of rights (if any) included therein, are overruled.

3.      The Bid Procedures, in the form attached as <u>Exhibit 1</u> hereto, are

approved in all respects.

4.      The Auction for the Assets shall take place at 10:00 a.m. on July 12, 2022

at the offices of counsel for the proposed buyer, Intuitive Funding, LLC (the "Buyer"),

Cohne Kinghorn, P.C., 111 East Broadway, 11th Floor, Salt Lake City, Utah.

---

[1] The remaining aspects of the Motion, other than approval of the Bid Procedures, will be
addressed at a later hearing as indicated below.

[2] Capitalized terms used by not otherwise defined herein shall have the meaning ascribed in the
Motion.

5.    The Sale Hearing to approve the Successful Bid(s) for the Assets shall be held before this Court on July 20, 2022, at 1:00 p.m.

6.    On or before July 7, 2022, the Trustee will file a notice (the "Cure Notice") with the Court and serve such Cure Notice on each non-debtor party to those executory contracts and unexpired leases that the Trustee, in the exercise of his business judgment, determine may be necessary to maximize value of any proposed sale transaction.  The Cure Notice shall:  (a) notify the non-debtor party that such party's contract or lease may be assumed and assigned to the purchaser of the Assets; (b) state the cure amounts that the Trustee believes are necessary to permit the assumption of such contracts and/or leases pursuant to Bankruptcy Code § 365 (the "Cure Amount"); (c) provide information regarding adequate assurances of future performance; and (d) provide notice of the deadline of June 1, 2022, for non-debtor parties to such contracts and/or leases to file objections (if any) to the Cure Amount, to the adequate assurances of future performance, and/or to the proposed assumption and assignment.

7.    Notwithstanding anything to the contrary in this Order or in the Motion or Bid Procedures: (i) the Buyer's bid for the Assets, as set forth in the APA, as may be amended, is hereby deemed a Qualified Bid for all purposes; and (ii) the Buyer is hereby deemed a Qualified Bidder for all purposes.

8.    The Trustee is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion and the Bid Procedures.

{00613113.DOCX / 2}

9.      Notwithstanding Bankruptcy Rule 6004 or otherwise, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing.

10.      This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

--------------------------------------------- **END OF ORDER** ----------------------------------------------

# EXHIBIT 1

**H2O TECH, INC.**

**BID PROCEDURES**

Set forth below are the bid procedures (the "Bid Procedures") to be employed with respect to the prospective sale (the "Sale") of the business and assets of H20 Tech, Inc. (the "Debtor") in connection with Bankruptcy Case No. 22-20446 (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court").  The Trustee will seek entry of an order from the Bankruptcy Court authorizing and approving the Sale to the Qualified Bidder(s) (as hereinafter defined) determined by the Trustee, in the exercise of its reasonable business judgment to have made the highest or otherwise best offer(s) to purchase the Debtor's assets (the "Successful Bidder(s)").

**Stalking Horse Bid**

The Trustee has received a "stalking horse" bid proposal (the "Stalking Horse Bid")[3] from Intuitive Funding, LLC (the "Buyer") as set forth in that certain Asset Purchase Agreement dated April 19, 2022 (as it may be amended, the "APA"), a copy of which will be provided together with these Bid Procedures.  The Stalking Horse Bid offers to purchase substantially all of the Debtor's assets (the "Assets").

Subject to the terms of the APA, the Buyer has offered to purchase the Assets, less the Excluded Assets for $35,000 (the "Initial Bid"), (i) subject to approval of the Bankruptcy Court and (ii) subject to higher or better offers made at the Auction and in accordance with these Bid Procedures.

**Participation Requirements**

Any potential bidder who desires to participate in the Auction must provide the Debtor on or before desires to continue to participate in the Bidding Process, the potential bidder must provide to the Trustee on or before June 27, 2022 at 4:00 p.m. prevailing Mountain time each of the following: (a) a "mark-up" of the APA to show any variances between the APA and the competing bid; (b) minimum consideration of $5,000 more than the APA; and (c) written proof satisfactory to the Trustee of the competing bidder's financial ability to perform.  Within 1 business day after receiving

---

[3] Any summary of or reference to the APA is qualified in its entirety by the APA itself, as provided together with these Bid Procedures.  To the extent there are any conflicts between any summary or reference and the APA, the terms of the APA shall govern.

these items the Trustee will notify any potential bidder and also the Buyer whether it has qualified as a Qualified Bidder.

## Auction

If, in addition to the APA, the Trustee receives one or more additional Qualified Bids on or prior to the Bid Deadline, the Trustee shall conduct an auction (the "Auction") with respect to any Assets as to which a Qualified Bid has been received.  The Auction shall take place on **July 12, 2022 at 10:00 a.m.** (Prevailing Mountain Time) at the offices of the Buyer's counsel, Cohne Kinghorn, P.C., 111 East Broadway, 11th Floor, Salt Lake City, Utah.  At the Trustee's discretion, Qualified Bidders may participate in the Auction by telephone or zoom.

The Trustee intends to conduct the Auction by announcing the highest and best Qualified Bid received.  The Trustee will then open the Auction to competing bids.  The Assets will be sold in two lots, first the assets identified in A(1-4) in the Binding Term Sheet, and then the assets identified in A(5) in the Binding Term Sheet.  The highest and best bid received by the Trustee will be the starting bid at the Auction.  Parties may submit successive bids by open cry.  All Qualified Bidders shall have the right to submit additional bids and make modifications to their respective Asset Purchase Agreements at the Auction to improve such bids.  The Auction may include individual negotiations between the Trustee and the Qualified Bidders.  The Trustee may announce a recess or recesses at any time and for any reasonable period during the Auction.  The parties may request a recess or recesses from the Trustee in order to consult with advisors, conduct individual negotiations with the Trustee, or for other reasons, and the Trustee may in his reasonable discretion agree to any such recess requested by either of the parties.  The Trustee will record the proceedings of the Auction.

At the Auction, the Trustee, will (a) review each bid elicited at the Auction on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale; and (b) identify the highest and/or otherwise best offer or group of offers for the Assets (the "Successful Bid(s)").  At the Sale Hearing, the Trustee will present the Successful Bid(s) for approval to the Bankruptcy Court and seek prompt entry of an order approving the Sale.

## Break-Up Fee

The Buyer will receive a break-up fee (the "Fee") in the event that its bid is not selected by the Trustee as the highest and best bid for either of the baskets of the Assets in an amount equal to the lesser of the following three amounts: (a) 3% of the total consideration received by the Trustee for the Assets from a bidder other than a Buyer; (b) one-third of the difference between $35,000 and the total consideration received by the Trustee from a bidder other than a Buyer for the Assets; and (c) the actual, necessary expenses incurred by the Buyer, including legal fees, due diligence and other costs incurred in connection with the Buyer's due diligence, negotiation and

documentation of the proposed purchase (including this Binding Term Sheet, bid procedures motion and order, and investigations under Fed. R. Bankr. P. 2004 to conduct due diligence), including any cost incurred for prototype demonstration, all as determined by the Bankruptcy Court.  The Break-Up fee shall be deemed an allowed super-priority administrative expense claim under sections 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code, senior to all other super-priority claims in the Debtor's bankruptcy case, other than the fees and expenses of the Trustee and his professionals.  The Break-Up Fee shall be due and payable to the Buyer upon the closing of a sale of any of the Assets to a buyer other than the Buyer.  The Trustee intends to take into account the Fee in his determination of the highest and best bid at the Auction.

## <u>Sale Hearing</u>

The Sale Hearing is presently scheduled to take place on **July 20, 2022, at 1:00 p.m.** before the Honorable William T. Thurman at the United States Bankruptcy Court for the District of Utah, located in Room 376 of the Frank E. Moss United States Courthouse, 350 South Main Street, Salt Lake City, Utah.  The Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing.  At the Sale Hearing, the Trustee shall present to the Bankruptcy Court for approval the Successful Bid(s) for the Assets (and/or other assets of the Debtor).

Following the Sale Hearing approving the Sale of the Debtor's assets to a Successful Bidder(s), if such Successful Bidder(s) fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder(s), the next highest or otherwise best bid resulting from the Auction, as disclosed at the Sale Hearing, shall be deemed to be the Successful Bid and the Trustee shall be authorized to effectuate such Sale without further order of the Bankruptcy Court.



----------------------------------END OF BID PROCEDURES----------------------------------

EXHIBIT A – BINDING TERM SHEET

***Binding Term Sheet for Acquisition of Certain Assets of H20 Tech, Inc., d/b/a Dentavations
(the "Debtor") and Related Matters***

***March 22, 2022***

This Binding Term Sheet is being delivered for purposes of negotiations between Intuitive Funding, LLC, or its assignee (the "Buyer") and Philip G. Jones (the "Trustee"), in his capacity as Chapter 7 trustee of the Debtor in connection with the Buyer's proposed acquisition of certain assets of the Debtor. Upon execution by both the Buyer and the Trustee, this Binding Term Sheet shall be an enforceable contract, binding both the Buyer and the Trustee to its terms.

**A. Asset Purchase**

The Buyer proposes to purchase the following assets of the Debtor (the "Assets"), to be more completely and definitively described in a definitive Asset Purchase Agreement (the "APA") to be entered into between the Buyer and the Trustee on or before March 28, 2022, subject to the terms and conditions of this Binding Term Sheet:

1. Any and all Waterjet prototypes;
2. All research files, documents, drawings, and research milestones of the Debtor;
3. The Debtor's rights in its patent license agreement with Brigham Young University (the "BYU License");
4. All patents, patent rights, and other intellectual property rights of the Debtor; and
5. All claims and causes of action of the Debtor, other than claims arising under Chapter 5 of the Bankruptcy Code (with the exception of any causes of action of the Debtor's estate for unauthorized post-petition transfers of any of the Assets, which the Trustee agrees to pursue at the Buyer's cost and expense for the benefit of the Buyer, if directed in writing by the Buyer to pursue a claim for unauthorized post-petition transfer), including without limitation any and all claims of the Debtor against current and former directors and officers of the Debtor.

**B. Purchase Price**

$15,000, separated into two baskets of assets, $10,000 payable for assets 1-4 above, and $5,000 for asset 5 above. Buyer's obligations to purchase the two baskets of assets are independent; meaning if another bidder offers a higher and better offer for one of the baskets, nevertheless Buyer will be obligated to purchase the assets in the other basket. The consideration will be payable upon the Closing (as defined in the APA). Upon execution of this term sheet, the Buyer will provide the Trustee with proof it has cash available to close the sale.

**C. Contingencies**

Buyer's obligation to purchase the Assets are subject to the following contingencies:

1. BYU's consent to the assignment of the BYU License to the Buyer;

2. A demonstration to the Buyer's satisfaction of the current working condition of all Waterjet prototypes, including confirmation that milestones have been reached;

3. Buyer will conduct discovery pursuant to Fed. R. Bankr. P. 2004 of the Debtor's former officers, to be completed not later than May 20, 2022; for any reason in Buyer's sole discretion it may exercise this contingency and terminate all obligations under this Binding Term Sheet and the APA on or before May 20, 2022.

**E. Bid Procedures Motion and Order**

The Trustee shall on or before May 5, 2022, obtain entry of a bid procedures order for the sale of its Assets acceptable to the Buyer. The Buyer must approve the bid procedures motion and order prior to their filing with the Bankruptcy Court. The Bid Procedures will require the following:

1. Any competing bid must be in writing, include a "mark-up" of the APA to show any variances between the proposal in the competing bid and the APA, provide for minimum consideration of $5,000 in excess of the consideration provided in this Binding Term Sheet, be presented to the Trustee on or before May 12, 2022 at 4:00 p.m. prevailing Mountain time, and include written proof satisfactory of the Trustee of the competing bidder's financial capacity to perform (any bid meeting these requirements is a "Qualified Bid")

2. The Buyer's offer in this Binding Term Sheet is deemed to be a Qualified Bid.

3. If the Trustee receives more than one Qualified Bid, the Trustee shall conduct an auction (the "Auction") among all Qualified Bidders on May 22, 2022. The Auction will be conducted using the following procedures. The Assets will be sold in two lots, first the assets identified in A(1-4) above, and then the assets identified in A(5) above. The highest and best bid received by the Trustee will be the starting bid at the Auction. Parties may submit successive bids by open cry. All Qualified Bidders shall have the right to submit additional bids and make modifications to their respective Asset Purchase Agreements at the Auction to improve such bids. The Auction may include individual negotiations between the Trustee and the Qualified Bidders. The Trustee may announce a recess or recesses at any time and for any reasonable period during the Auction. The parties may request a recess or recesses from the Trustee in order to consult with advisors, conduct individual negotiations with the Trustee, or for other reasons, and the Trustee may in his reasonable discretion agree to any such recess requested by either of the parties. The Trustee will record the proceedings of the Auction.

4.  The Buyer will receive a break-up fee (the "Fee") in the event that its bid is not selected by the Trustee as the highest and best bid for either of the baskets of the Assets in an amount equal to the <u>lesser</u> of the following three amounts: (a) 3% of the total consideration received by the Trustee for the Assets from a bidder other than a Buyer; (b) one-third of the difference between $15,000 and the total consideration received by the Trustee from a bidder other than a Buyer for the Assets; and (c) the actual, necessary expenses incurred by the Buyer, including legal fees, due diligence and other costs incurred in connection with the Buyer's due diligence, negotiation and documentation of the proposed purchase (including this Binding Term Sheet, bid procedures motion and order, and investigations under Fed. R. Bankr. P. 2004 to conduct due diligence), including any cost incurred for prototype demonstration, all as determined by the Bankruptcy Court. The Break-Up fee shall be deemed an allowed super-priority administrative expense claim under sections 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code, senior to all other super-priority claims in the Debtor's bankruptcy case, other than the fees and expenses of the Trustee and his professionals.  The Break-Up Fee shall be due and payable to the Buyer upon the closing of a sale of any of the Assets to a buyer other than the Buyer.

**H.  Sale Order**

Upon the execution of the APA, the Trustee shall immediately seek entry of an order of the Bankruptcy Court approving and authorizing the sale to the Buyer in accordance with the Agreement (the "Sale Motion").  The Sale Motion and the Sale Order shall be in form and substance acceptable to the Buyer.  The Sale Order shall include findings and conclusions pursuant to Bankruptcy Code § 365 that any defaults, including both monetary and non-monetary defaults under the BYU License, are cured in connection with the sale to the Buyer.  The sale shall be free and clear of any and all liens, claims, encumbrances, and interests to the fullest extent possible under Bankruptcy Code § 363(f).

**I.  Closing Deadline**

The Closing of the sale of Assets pursuant to the APA shall occur no later than May 27, 2022.

**INTUITIVE FUNDING, LLC**


_____                    _____
By:                                                                        Philip G. Jones, in his capacity as
Its:                                                                       Chapter 7 Trustee of the Debtor

{00608536.DOCX /}

EXHIBIT B – ASSET PURCHASE AGREEMENT

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is entered into and effective as of April 21, 2022, between Intuitive Funding, LLC or its assignee (the "Buyer") and Philip G. Jones (the "Trustee"), not individually but solely in his capacity as the Chapter 7 bankruptcy trustee of the estate of H20 Tech, Inc. (the "Debtor"). The Buyer and the Seller are referred to collectively herein as the "Parties" and individually as a "Party."

A.     The Debtor filed a voluntary petition under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Utah (the "Bankruptcy Court"), Case No. 22-20446 WTT (the "Bankruptcy Case") on February 11, 2022;

B.     The Seller conducts business under the trade names Dentavations and Waterjet International, Inc., and was in the business of commercializing technology patented by Brigham Young University ("BYU") to use a fluid stream for dental cavity preparations rather than a metal drill bit (the "Business");

C.     The Seller wishes to sell to the Buyer, and the Buyer wishes to purchase from the Seller, substantially all of the Seller's assets, free and clear of liens, claims, encumbrances and interests pursuant to Bankruptcy Code § 363;

D.     The Seller wishes to assign to the Buyer, and the Buyer wishes to assume from the Seller, certain executory contracts and unexpired leases pursuant to Bankruptcy Code § 365; and

E.     On or about March 23, 2022, the Parties entered into a Binding Term Sheet (the "Binding Term Sheet") related to the asset sale contemplated by this Agreement;

Now, therefore, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties hereby agree as follows.

## <u>DEFINITIONS</u>

The following terms shall have the meanings set forth below as used in this Agreement:

"Accounts Receivable" means any and all accounts receivable, trade receivables, notes receivable and other receivables of the Seller arising out of the Business.

"Agreement" means this Asset Purchase Agreement, including all Exhibits hereto, as it may be amended from time to time in accordance with its terms.

"Assets" means the Seller's interest in following assets:

(a)     Any and all Waterjet prototypes and parts of prototypes;

(b)     with the exception of the books and records included in the definition of Excluded Assets below, all books, records and accounts, correspondence, research files,

research milestones, production records, technical, accounting, manufacturing and procedural manuals, customer lists, vendor lists, sales materials and records, quality control records and procedures, employment records, research material, drawings, studies, reports or summaries of any operation, present or former, and any information (including confidential information) which has been reduced to writing relating to or arising out of the operation of the Business;

(c)     the Assumed Contracts;

(d)     all right, title and interest of the Seller in and to the Intellectual Property;

(e)     all Equipment of the Seller used in the operation of the Business, wherever located and all warranties and guarantees, if any, express or implied, existing on the Closing Date for the benefit of the Seller in connection with the Equipment;

(f)     all management information systems, computers, hardware and software either owned by the Seller or otherwise used in the operation of the Business;

(g)     All claims and causes of action of the Debtor, other than claims arising under Chapter 5 of the Bankruptcy Code (with the exception of any causes of action of the Debtor's estate for unauthorized post-petition transfers of any of the Assets, which the Seller agrees to pursue at the Buyer's cost and expense for the benefit of the Buyer, if directed in writing by the Buyer to pursue a claim for unauthorized post-petition transfer), including without limitation any and all claims of the Debtor against the Buyer, Thomas and Natalie Thatcher, and all other current and former directors and officers of the Debtor;

(m)     all Accounts Receivable; and

(n)     all goodwill and going concern value in or arising from the Assets and the Business;

provided, however, that, notwithstanding the foregoing, the term "Assets" shall not include the Excluded Assets.

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement, substantially in the form attached hereto as Exhibit A

"Assumed Contracts" shall mean those Contracts of the Seller that are listed on Exhibit B hereto, as such exhibit may be amended by agreement of the Buyer and the Seller prior to the Closing Date. Exhibit B includes a list of the Contracts relating to the Business to be assumed by the Seller and assigned to the Buyer pursuant to Bankruptcy Code § 365, and in each instance an amount determined by the Seller in good faith, which the Seller believes represents the amount, if any, required to cure any defaults under each of the Assumed Contracts pursuant to Bankruptcy Code § 365(b)(1).

"Bankruptcy Case" shall have the meaning assigned to it in the Recitals.

"Bankruptcy Code" shall have the meaning assigned to it in the Recitals.

"Bankruptcy Court" shall have the meaning assigned to it in the Recitals.

"Bill of Sale" means the Bill of Sale, substantially in the form attached hereto as <u>Exhibit C</u>.

"Binding Term Sheet" shall have the meaning assigned to it in the Recitals.

"BYU" shall have the meaning assigned to it in the Recitals.

"BYU License" shall have the meaning assigned to it in Exhibit B.

"Claims" means all claims, encumbrances, liabilities, options, charges, obligations, Taxes, Employee Claims, Environmental Liabilities, rights of third parties (express or implied), restrictions, licenses, and interests of any kind or nature whatsoever, including, but not limited to, the definition of "claim" under the Bankruptcy Code.

"Closing" means the consummation of the transactions contemplated herein in accordance with Article III hereof.

"Closing Date" means the date on which the Closing occurs or is to occur.

"Closing Payment" shall have the meaning assigned to it in Section 1.02.

"Contract" means all contracts, leases, deeds, commitments, undertakings, sales orders, purchase orders, indentures, mortgages, notes, bonds, instruments, licenses and all other agreements, commitments and legally binding arrangements, whether written or oral.

"Cure Amounts" means the amounts designated by the Seller as the "cure amount" with respect to each of the Assumed Contracts on <u>Exhibit B</u>.

"Employee Claims" means (i) any claims for severance pay, termination pay, redundancy pay, pay in lieu of notice or any other claim for similar compensation or damages relating to the termination of any employee or independent contractor of the Seller prior to the Closing Date, or (ii) any claims for compensation by any employee or independent contractor of the Seller for services rendered prior to the Closing Date.

"Encumbrance" means any and all Liens and Claims.

"Environmental Law(s)" means any federal, state or local law (including any statute, rule,

regulation, ordinance, code or rule of common law), and any judicial or administrative interpretation thereof, and any decree, judgment, policy, written guidance or judicial or administrative order relating to the environment, health, safety, or Hazardous Materials, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9901 et seq., the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq., the Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Federal Water Pollution Control Act, 33 U.S.C. §1251 et seq., the Toxic Substance Control Act, 15 U.S.C. § 2601 et seq., the Safe Drinking Water Act, U.S.C. § 300f et seq., the Occupational Safety and Health Act, 42 U.S.C. § 1801 et seq., the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 136 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., and their state counterparts or equivalents, all as amended, and any regulations or rules adopted or publications promulgated pursuant thereto.

"Environmental Liabilities" means Claims under any Environmental Law relating to the operation of the Business; provided, that such Claims relate to violations of Environmental Law (and only to such extent) that existed on or prior to the Closing Date.

"Equipment" means any and all of the machinery, equipment, installations, furniture, tools, molds, spare parts, supplies, maintenance equipment and supplies, materials, automobiles, trucks and other vehicles and other items of personal property of every kind and description, of the Seller used in connection with the Business.

"Excluded Assets" means the following tangible and intangible assets of the Seller:

(a)      all of the Seller's cash and cash equivalents, interests in deposit or checking accounts, certificates of deposit, treasury bills and other marketable securities of the Seller as of the Closing Date, and the Purchase Price;

(b)      all Contracts other than the Assumed Contracts;

(c)      all business books and records of the Seller which the Seller reasonably deems necessary to administer the Seller's bankruptcy estate; provided that the Buyer shall have access to such books and records and the right to make a copy of such books and records at the Buyer's expense;

(f)      all Claims of the Debtor or its bankruptcy estate which are not included within item (g) of the definition of the Assets.

"Final Order" means an order of the Bankruptcy Court which waives the stay period which would otherwise apply under Fed. R. Bankr. P. 6004(g), or which does not waive the stay under Fed. R. Bankr. P. 6004(g) and the stay period has elapsed, that is final, and not subject to any stay.

"Governmental Authority" means the government of the United States or any state or

political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Hazardous Materials" means any materials which are crude or refined oil or fractions thereof, petroleum, PCBs, friable asbestos, urea formaldehyde, flammable explosives, radioactive materials, hazardous wastes, toxic, mutagenic or pathogenic substances, paint containing lead or mercury; including, without limitation, any substances which are substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," or "toxic substances" under any applicable federal or state laws or regulations.

"Intellectual Property" means all United States and foreign patents, patent registrations and patent applications, patent licenses, trade names, brand names, logos, trademarks, trademark licenses, service marks and trademark registrations (and applications therefor, including intent-to-use applications, and all issuances, extensions and renewals of such registrations and applications), copyrights, copyright registrations, copyright licenses (and applications therefor, and all issuances, extensions and renewals of such registrations and applications), confidential information, trade secrets, inventions, processes, designs, devices, know-how, show-how, recipes, formulae, methods, compositions, operating manuals, computer software, technology or the like, and all applications for any of the foregoing, in each case, held by the Seller and as used in the conduct of the Business, together with the goodwill associated therewith and including all rights to sue for past infringement in connection therewith; including without limitation all rights, patents, and patent applications listed on Page 10 of 10 of Docket No. 9 filed in the Bankruptcy Case.

"Lien" means any interest in property securing an obligation, whether such interest is based on common law, statute, or contract (and including, but not limited to, any security interest or lien arising from a mortgage, pledge, charge, easement, servitude, security agreement, conditional sales or trust receipt, or a lease, consignment or bailment for security purposes), reservations, exceptions covenants, conditions, restrictions, leases, subleases, licenses, occupancy agreements, pledges, equities, charges, assessments, covenants, reservations, mechanics' liens, Taxes, defects in title, encroachments and other burdens, and other title exceptions and encumbrances affecting property of any nature, whether accrued or unaccrued, tangible or intangible, or absolute or contingent, including, but not limited to, the definition of "lien" under the Bankruptcy Code.

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to the business, results of operations, condition (financial or otherwise) or prospects of the Business.

"Purchase Price" shall have the meaning set forth in Section 1.02.

"Tax" or "Taxes" means all taxes, charges, fees, duties, levies or other assessments, including (without limitation) income, gross receipts, net proceeds, ad valorem, turnover, real

and personal property (tangible and intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, severance and employees, income withholding, unemployment and Social Security taxes, which are imposed by the United States, or any state, local or foreign government or subdivision or agency thereof, and such term shall include any interest, penalties or additions to tax attributable to such Taxes.

# ARTICLE I
## PURCHASE AND SALE

Section 1.01.  Sale and Purchase.  Subject to the terms and conditions set forth in this Agreement, on the Closing Date, the Seller shall sell, assign, transfer, convey and deliver to the Buyer, and the Buyer shall accept, acquire and take assignment and delivery of, all the Seller's right, title and interest in, to and under all of the Assets.  The Seller shall transfer the Assets to the Buyer pursuant to a Bill of Sale substantially in the form of Exhibit C.  The Buyer shall purchase the Assets pursuant to a Final Order of the Bankruptcy Court, free and clear of all Encumbrances to the fullest extent possible under Bankruptcy Code Section 363(f).  The Buyer acknowledges that it is not purchasing, and the Seller is not selling, any of the Excluded Assets under this Agreement.

Section 1.02.  Payment of Purchase Price.  Subject to the terms and conditions hereof, the Buyer shall provide consideration for the transfer of the Assets described in Section 1.01 (the "Purchase Price") in the amount of  $35,000, payable by the Buyer to the Seller on the Closing Date (the "Closing Payment").

Section 1.03    Effect on Binding Term Sheet.  The Parties acknowledge that the Binding Term Sheet remains a contract binding on both Parties.  However, this Agreement replaces and supersedes the following portions of the Binding Term Sheet:  items (A) through (C) and (I).  The remaining provisions of the Term Sheet shall remain in full force and effect.

# ARTICLE II
## PRE-CLOSING COVENANTS

The Parties agree that from the date hereof to the Closing Date:

Section 2.01    Implementing Agreement.  The Parties will use their best efforts in good faith to perform and fulfill all conditions and obligations to be fulfilled or performed by them hereunder, to the end that the transactions contemplated hereby will be fully and timely consummated.  The Seller covenants and agrees that it shall as soon as practicable after execution of this Agreement take all steps necessary to obtain a Final Order of the Bankruptcy Court approving this Agreement and the transactions contemplated hereby (including, without limitation the assumption of the Assumed Contracts, and the sale of the Assets, in each case free and clear of all Encumbrances to the fullest extent possible under Bankruptcy Code Section 363(f)).

Section 2.02    <u>Consents and Approvals</u>.  The Parties will use their reasonable best efforts to obtain all necessary consents and approvals to the performance of their respective obligations under this Agreement and the transactions contemplated hereby.  The Parties will make all filings, applications, statements and reports to all Governmental Authorities which are required to be made prior to the Closing Date pursuant to any applicable statute, rule or regulation in connection with this Agreement and the transactions contemplated hereby.  The Parties will seek to obtain BYU's consent to the assumption and assignment of the BYU License, without payment of any cure costs to BYU.

Section 2.03    <u>Access to Information</u>.  The Seller shall give the Buyer and the Buyer's representatives full access during normal business hours, to all of the facilities, properties, books, contracts, commitments and records relating to the Business.  In order that the Buyer may have full opportunity to make such examination and investigation as it may desire of the Business, the Seller will furnish the Buyer and its representatives during such period with all such information as such representatives may reasonably request.

Section 2.04    <u>Subject to Higher and Better Offers</u>.  This sale and the transactions contemplated by this Agreement are subject to higher and better offers.  That means that if another buyer is willing to purchase the Assets, or a portion of the Assets, for consideration which the Seller believes in good faith represents a higher and better offer for some or all of the Assets, then the Seller may accept that higher and better offer.  However, if the Seller receives a higher and better offer from a third party, the Seller will provide the Buyer with an opportunity to submit an even higher offer.  The Seller intends to publicize the sale of the Assets, and to provide other parties will access to information concerning the Assets, provided that any party provided access to information concerning the Assets shall have first executed an appropriate non-disclosure agreement.  The Seller will request the Bankruptcy Court to approve his conduct of a public auction sale of the Assets on July 12, 2022.

## ARTICLE III
## CLOSING

Section 3.01    <u>Closing</u>.  Subject to the satisfaction or waiver of each of the conditions set forth in Article VI hereof, the Closing shall take place at the offices of Cohne Kinghorn, P.C., P.C. no later than July 26, 2022.

Section 3.02    <u>Deliveries by the Seller</u>.  At the Closing, the Seller will deliver to the Buyer the following:

(a)    The Bill of Sale, executed by the Seller, substantially in the form attached hereto as <u>Exhibit C</u>, transferring the Assets to the Buyer; and

(b)    The Assignment and Assumption Agreement, executed by the Seller, substantially in the form attached hereto as <u>Exhibit A</u>.

Section 3.03    Deliveries by the Buyer.  At the Closing, the Buyer will deliver to the Seller the following:

(a)    the Closing Payment; and

(b)    the Assignment and Assumption Agreement, executed by the Buyer, substantially in the form attached hereto as Exhibit A.

# ARTICLE IV
# CONDITIONS TO CLOSING

Section 4.01    Conditions to Obligations of Both Parties.  The obligations of each Party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    Neither the Bankruptcy Court nor any other Governmental Authority shall have enacted, issued, promulgated, enforced or entered any order, decree or ruling or taken any other action which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)    The Parties shall have received all consents, authorizations, orders and approvals from Governmental Authorities that are required in connection with the consummation of the transactions contemplated by this Agreement, including the Final Order, in each case, in form and substance reasonably satisfactory to the Buyer and the Seller, and no such consent, authorization, order and approval shall have been revoked.

Section 4.02    Conditions to Obligations of the Buyer.  The obligations of the Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or the Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)    BYU shall have consented to the assumption and assignment of the BYU License to the Buyer, without payment of any cure costs;

(b)    the Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date;

(c)    no action shall have been commenced against the Buyer or the Seller, which would prevent the Closing;

(d)    no injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits the transactions contemplated hereby;

(e)     from the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect; and

(f)     the Seller shall have delivered to the Buyer duly executed counterparts of the deliverables described in Section 3.02.

Section 4.03   <u>Conditions to Obligations of the Seller</u>.  The obligations of the Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or the Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)     the Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the other Transaction Documents to be performed or complied with by it prior to or on the Closing Date;

(b)     no injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits the transactions contemplated hereby; and

(c)     the Buyer shall have delivered to the Seller the deliverables described in Section 3.03.

## ARTICLE V
## POST-CLOSING COVENANTS

The Parties agree to perform and/or observe, as may be the case, the provisions of this Article V with respect to the period following the Closing Date.

Section 5.01    Further Assurances.  In case at any time after the Closing Date any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action, including the execution and delivery of additional instruments and documents, as the other Party reasonably may request, all at the sole cost and expense of the requesting Party.

Section 5.02    Litigation Support.  In the event and for so long as any Party actively is contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand regarding a third party(ies) in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction occurring on or prior to the Closing Date involving the Business, the other Party will cooperate with the contesting or defending Party and its counsel in the contest or defense, reasonably make available its personnel, and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party.

## ARTICLE VI
## TERMINATION

Section 6.01    Termination.  This Agreement may be terminated at any time on or prior to the Closing Date:

(a)    with the written mutual consent of the Seller and the Buyer;

(b)    by the Buyer, if the Buyer is not satisfied for any reason with the results of its due diligence investigation of the Business, including, but not limited to, the Buyer's understanding of the sales process and sales forecasts of the Business, the Buyer's review of the industry in which the Business operates, the Buyer's review of all legal, financial and accounting matters pertaining to the Business, but only if Buyer gives Seller written notice of such termination on or before July 7, 2022;

(c)    by the Buyer or the Seller, if any court, including the Bankruptcy Court, or any Governmental Authority has issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, and such order, decree, ruling or other action has become final and non-appealable; provided that this Agreement shall not be terminated unless the Party terminating this Agreement has utilized its reasonable best efforts to oppose the issuance of such order, decree or ruling or the taking of such action;

(d)      by either the Buyer or the Seller, if the other Party is in material breach of any representation, warranty, covenant or agreement contained in this Agreement and fails to cure such breach within fifteen (15) days of notice of such breach by the non-breaching Party (provided, that no Party may terminate the Agreement under this clause if such Party is in material breach of its obligations under this Agreement);

(e)      by the Buyer, if prior to the Closing Date BYU has not consented to the assumption and assignment of the BYU License to the Buyer, without requiring the payment of any cure costs;

(f)      by the Buyer, if prior to the Closing Date, the Debtor's prototype devices do not operate to the satisfaction of the Buyer in its sole discretion;

(g)      by the Buyer, if the Bankruptcy Court has not issued on or before July 22, 2022, a Final Order, reasonably acceptable to the Buyer, approving the transactions contemplated hereby; and

(f)      by either the Buyer or the Seller, if the Closing has not occurred on or prior to July 26, 2022, for any reason other than the breach of any provision of this Agreement by the Party seeking to terminate this Agreement.

In the event of any termination pursuant to this Section 8.01, written notice setting forth the reasons thereof shall forthwith be given by the Buyer, if the Buyer is the terminating party, to the Seller, or by the Seller, if the Seller is the terminating party, to the Buyer.

   Section 6.02 Effect of Termination; Remedies.

  (a)      In the event of termination pursuant to Section 6.01, this Agreement shall become null and void and have no effect (other than this Article VI, which shall survive termination), with no liability on the part of the Seller or the Buyer, or their respective directors, officers, employees, agents or stockholders, with respect to this Agreement.

  (b)      This Article VI shall terminate upon the Closing.

## ARTICLE VII
## MISCELLANEOUS

  Section 7.01 Expenses.  Subject to the terms of this Agreement, each Party shall bear its own expenses with respect to the transactions contemplated by this Agreement; provided however that nothing in this Section amends or modifies item (E)(4) of the Term Sheet in the event that a person submits a higher and better offer for the purchase of some or all of the Assets.

  Section 7.02 Survival.  All covenants and agreements made herein or in any document delivered pursuant to this Agreement shall survive the Closing Date and remain in full force and effect in accordance with their respective terms and until the applicable statute of limitations has expired.

Section 7.03   <u>Amendment</u>.  This Agreement may be amended, modified or supplemented only in a writing signed by each of the Parties.

Section 7.04    Notices.  Any notice, request, instruction or other document to be given hereunder by a Party shall be in writing and shall be deemed to have been given, (i) when received if given in person, (ii) on the date of acknowledgment of receipt if sent by telex, facsimile or other wire transmission or (iii) three days after being deposited in the U.S. mail, certified or registered mail, postage prepaid:

If to Seller, addressed to seller as follows:

> Philip G. Jones
> 1215 South Main Street
> Orem, Utah 84058
> trustee@theo7.com

If to Seller, addressed to Seller as follows:

> Intuitive Funding, LLC
> Attn: Thomas Thatcher, Manager
> thomas.thatcher@me.com

> with a copy to:

> George Hofmann
> Cohne Kinghorn, P.C.
> 111 East Broadway, 11th Floor
> Salt Lake City, Utah 84111
> ghofmann@ck.law

or to such other individual or address as a Party may designate for itself by notice given as herein provided.

Section 7.05    Waivers.  The failure of a Party at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.  No waiver by a Party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach in other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

Section 7.06    Counterparts; Facsimile Signatures.  This Agreement (and any agreement, certificate or other document delivered hereunder) may be executed simultaneously in counterparts and with facsimile signatures, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 7.07    Headings.  The headings preceding the text of Articles and Sections of this Agreement are for convenience only and shall not be deemed part of this Agreement.

Section 7.08 <u>Applicable Law</u>. This Agreement shall be governed by and construed and enforced in accordance with the internal laws of the State of Utah.

Section 7.09 <u>Consent to Jurisdiction</u>. Any legal action or other proceeding for any purpose with respect to this Agreement shall be brought in the Bankruptcy Court. The Parties hereby submit to the exclusive jurisdiction of the Bankruptcy Court and waive any objection to the propriety or convenience of venue in the Bankruptcy Court.

Section 7.10 <u>Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, personal representatives, successors and assigns.

Section 7.11 <u>Entire Understanding</u>. This Agreement (including the Exhibits attached hereto and the agreements and other ancillary documents referenced or contemplated herein) set forth the entire agreement and understanding of the Parties in respect to the transactions contemplated hereby and supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other person any rights or remedies hereunder. There have been no representations or statements, oral or written, that have been relied on by either Party, except those expressly set forth in this Agreement.

Section 7.12 <u>Parties in Interest</u>. This Agreement shall be binding upon and inure solely to the benefit of each Party and its permitted assigns, and nothing in this Agreement, express or implied, is intended to confer any rights or remedies of any nature whatsoever under or by reason of this Agreement upon any other person. Nothing in this Agreement shall be construed to create any rights or obligations except among the Parties, and no person or entity shall be regarded as a third-party beneficiary of this Agreement.

Section 7.13 <u>Interpretation</u>. The Parties hereby acknowledge and agree that: (i) each Party and its counsel reviewed and negotiated the terms and provisions of this Agreement and have contributed to their revision; (ii) the rule of construction to the effect that any ambiguities are resolved against the drafting Party shall not be employed in the interpretation of this Agreement; and (iii) the terms and provisions of this Agreement shall be construed fairly as to both Parties hereto and not in favor of or against either Party, regardless of which Party was generally responsible for the preparation of this Agreement.

     Section 7.14   <u>Severability</u>.  In the event that any court of competent jurisdiction shall finally determine that any provision, or any portion thereof, contained in this Agreement shall be void or unenforceable in any respect, then such provision shall be deemed limited to the extent that such court determines it enforceable, and as so limited shall remain in full force and effect. In the event that such court shall determine any such provision, or portion thereof, wholly unenforceable, the remaining provisions of this Agreement shall nevertheless remain in full force and effect.

     **IN WITNESS WHEREOF**, the Parties have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

INTUITIVE FUNDING, LLC

By:_____
    Thomas Thatcher, Manager

By:_____
    Philip G. Jones, not individually but
    solely in his capacity as Chapter 7
    Trustee for the Debtor

**Exhibit A**

**Form of Assignment and Assumption Agreement**

**TO BE PROVIDED PRIOR TO THE SALE HEARING**

**Exhibit B**

**Assumed Contracts**

| Name and Mailing Address | Description of Contract | Cure Amount |
|---|---|---|
| Technology Transfer Office<br>3760 HBLL<br>Brigham Young University<br>P.O. Box 21231<br>Provo, Utah 84602-1231 | Exclusive License Agreement with Waterjet International, LLC effective March 25, 2009, as amended by first amendment, second amendment, third amendment, and fourth amendment (collectively, the "BYU License") | $0 |

**Exhibit C**

**Form of Bill of Sale**

**TO BE PROVIDED PRIOR TO THE SALE HEARING**